**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Josiah English, III,

   Plaintiff,

v.

Alexander Cost, in his individual and official capacities; Jennifer Munnell, in her individual and official capacities,

   Defendants.

No. CV-19-04746-PHX-GMS

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Pursuant to Federal Rule of Civil Procedure 52(a), the Court hereby makes its findings of fact and its conclusions of law in the above-captioned case.

## I. INTRODUCTION

Plaintiff Josiah English III—previously an inmate at Lower Buckeye Jail ("Lower Buckeye") in Maricopa County, Arizona—filed this prisoner civil rights action under 42 U.S.C. § 1983 against Defendant Sergeant Alexander Cost ("Sgt. Cost") and Defendant Sergeant Jennifer Munnell ("Sgt. Munnell"), two detention officers at Lower Buckeye.

Plaintiff brings two claims. First, he alleges that on November 1, 2017, Defendants violated the First Amendment by improperly opening and reading his legal mail, including his attorney-client privileged communications, outside of his presence. Second, he avers that Defendants illegally retaliated against him, in violation of the First Amendment, after he filed multiple grievances against Maricopa County Sheriff's Office ("MCSO") officials and a lawsuit against Maricopa County. Plaintiff seeks compensatory and punitive

damages, reasonable attorneys' fees, and a declaratory judgment that Defendants' actions violated the First Amendment.

The Court held a three-day bench trial in the matter from May 12–14, 2026. The evidence presented at trial included live testimony from five witnesses[1] and the admission of over 100 exhibits. The Court has heard and weighed all the evidence and testimony presented at trial, observed the demeanor of witnesses and evaluated their credibility and candor, and heard and considered Plaintiff's and Defendants' arguments. At the conclusion of Plaintiff's case, Defendants made an oral motion for partial findings as a matter of law under Federal Rule of Civil Procedure 52(c). (Doc. 175). The Court deferred ruling on Defendants' motion until the close of Defendants' case. The Court now enters its findings of fact and conclusions of law in the matter.[2]

For the reasons that follow, the Court concludes that (i) Defendants are entitled to qualified immunity on the issue of opening and inspecting Plaintiff's legal mail outside of his presence during a cell search; (ii) Plaintiff has failed to establish by a preponderance of the evidence that Defendants read his legal mail outside of his presence; and (iii) Plaintiff has failed to establish by a preponderance of the evidence that any of Defendants' actions— such as searching Plaintiff's cell or transferring him to a different cell—were taken in retaliation for Plaintiff's protected First Amendment activity. Accordingly, Plaintiff has not demonstrated entitlement to damages, attorneys' fees, or declaratory relief. Thus, the Court enters judgment in favor of Defendants and dismisses this action.

## II.    FINDINGS OF FACT

### A.    Plaintiff Was Detained at Lower Buckeye Jail in Maricopa County

The claims in this case arise out of a search of Plaintiff's cell at Lower Buckeye that occurred on November 1, 2017 (the "Cell Search"). Lower Buckeye is a county detention

---

[1] The five witnesses were Plaintiff; Sergeant George Alvarez; Sergeant Alexander Cost; Sergeant Jennifer Munnell; and since-retired Sergeant Michelle Metzler.

[2] To the extent any findings of fact as stated may also be deemed to be conclusions of law, they shall also be considered conclusions of law. *See In re Bubble Up Del., Inc.*, 684 F.2d 1259, 1262 (9th Cir. 1982). Similarly, to the extent any conclusions of law as stated may be deemed to be findings of fact, they shall also be considered findings of fact. *See id.*

facility in Phoenix, Arizona that houses individuals who have been arrested across Maricopa County. The facility is operated by the MCSO.

Plaintiff first arrived at Lower Buckeye on February 1, 2017, in connection with a charge for which he was later convicted in Arizona state court. He remained at Lower Buckeye until July 24, 2023. (Pl.'s Ex. 7). During his approximately six-year stay at Lower Buckeye, Plaintiff had 20 different bed assignments: two prior to November 7, 2017, and eighteen after that date. (*Id.*). On the date of the Cell Search, Plaintiff was housed in Cell 24 of Pod A of Tower 24 at Lower Buckeye ("Plaintiff's Cell" or "Cell 24"), where he had resided since May 12, 2017. (*Id.*). Plaintiff shared Cell 24 with another inmate.

### 1.     Design and Layout of Pod A of Tower 24

Pod A[3] of Tower 24 ("Pod A") has two floors. Plaintiff's Cell was located on the second floor. There are eighteen cells in total on the second floor of Pod A. In addition, there are showers on the second floor, which are located down the hallway to the right upon exiting Plaintiff's Cell. From the shower area, there is no visibility into Plaintiff's Cell. There are two sets of stairs—located down the hallway on either side of Plaintiff's Cell— that provide access between floors. (Pl.'s Ex. 11).

The dayroom—a communal open space—is located on the first floor.[4] (Pl.'s Ex. 11). From the dayroom, an individual can access the recreation athletic yard, which is separated from the dayroom by a wall with a door. Although the wall separating the recreation yard from the dayroom has windows, on November 1, 2017, those windows were covered with diamond plating, limiting any visibility through them. However, a window on the door of the recreation yard—roughly between the size of a basketball and a large computer monitor[5]—provided some visibility into the dayroom, first floor, and

---

[3] A "pod" is a cluster of jail cells arranged around a central dayroom.
[4] The first floor has eighteen jail cells, a set of showers, a janitor room, a training room, an interview room, and a multi-purpose room. (Pl.'s Ex. 10).
[5] Sgt. Cost testified that the size of the window was "a lot bigger than a basketball," agreed that it was "bigger than the monitor in front of [him] right now," and was unsure if it was "twice as big as the monitor in front of [him] right now." (Trial Tr. at 207:21–208:09).

- 3 -

second floor.  From that window, one can view the doorway of Plaintiff's Cell.  The distance from the recreation yard door to Plaintiff's Cell is roughly between 45 and 60 feet.

The layout of the first and second floor of Pod A—when observed downwards from an aerial view—is shown below.  Plaintiff's Cell is highlighted in a red box; the second-floor showers are highlighted in a green box; and the first-floor recreation yard is highlighted in a blue box.



(Pl.'s Exs. 10–11).

### 2.    Cameras in Pod A

There are three different cameras in Pod A that capture the hallway and door to Plaintiff's Cell.[6] The first angle provides the clearest video footage and displays Plaintiff's Cell in the top left corner, as well as a set of stairs and portions of the dayroom.  (Pl.'s Ex. 123 ("Camera Angle 1")).  The second angle, although not as high in picture quality, provides a more direct view of Plaintiff's Cell, as well as a greater portion of the dayroom.

---

[6] The Court's previous order discussing the spoliation of any footage captured by these cameras (see Doc. 161 at 4–12) is fully incorporated here by reference.

(Pl.'s Ex. 124 ("Camera Angle 2")).  Finally, the third angle—the worst in picture quality among the three shots—provides the greatest visibility of the dayroom but the worst visibility of Plaintiff's Cell.  (Pl.'s Ex. 125 ("Camera Angle 3")).  Each of the camera angles are displayed below, with Plaintiff's Cell highlighted in a red box.



(Camera Angle 1).



(Camera Angle 2).

(Camera Angle 3).

These three cameras were all recording footage on November 1, 2017. However, no footage from these cameras on that date was introduced into evidence. Under MCSO policy at the time, surveillance footage that is not preserved within 60 days of creation is automatically overwritten by new security footage. (Doc. 161 at 5). Defendants informed Plaintiff during discovery in this suit that no video footage related to the Cell Search was in their possession, custody, or control. (*Id.*). Thus, any video footage from these three cameras of the Cell Search was automatically overwritten by new security footage on or around December 31, 2017.

B.    **In the Lead Up to the Cell Search, Plaintiff Communicated with His Legal Team in His Criminal Case and Stored His Legal Mail in a Legal Box in His Cell**

During his time at Lower Buckeye, Plaintiff was represented by legal counsel in connection with his pending criminal proceeding. In addition to counsel, Plaintiff's legal

team included mitigation specialists.  Plaintiff communicated with his legal counsel and mitigation specialists through written letters, video visits, and in-person visits.

Plaintiff received written letters from legal counsel and his mitigation specialists through the mail and during visitation.  These communications—protected by the attorney-client privilege—are considered "legal mail" under MCSO policy.  At Lower Buckeye, MCSO documented each inmate's incoming and outgoing legal mail received and sent via mail service, as well as each letter received from counsel or mitigation specialist through visitation.

### 1.    Plaintiff's Protected Communications

Plaintiff communicated with his legal team in his criminal case prior to the Cell Search.  He stored his protected communications in a box in his cell.  At trial, Plaintiff introduced into evidence the following pieces of protected legal communication that had been drafted or received before November 1, 2017:

- A memorandum from Plaintiff's mitigation specialist, dated April 25, 2017, and clearly marked as "Confidential Work Product/Attorney-Client Privileged."  (Pl.'s Ex. 25).

- A memorandum from Plaintiff's mitigation specialist, dated April 26, 2017, and clearly marked as "Confidential Work Product/Attorney-Client Privileged."  (Pl.'s Ex. 26).

- A memorandum from Plaintiff's mitigation specialist, dated April 26, 2017, and clearly marked as "Confidential Work Product/Attorney-Client Privileged."  (Pl.'s Ex. 27).

- A memorandum from Plaintiff's mitigation specialist, dated May 9, 2017, and clearly marked as "Confidential Work Product/Attorney-Client Privileged."  (Pl.'s Ex. 28).

- A letter from Plaintiff's attorney, dated February 6, 2017, that was received on February 13, 2017, and stamped as "PRIVILEGED."  (Pl.'s Exs. 127–128).

- A handwritten copy of a letter drafted by Plaintiff on March 16, 2017, and mailed to his attorney on March 20, 2017, in which Plaintiff discusses his pending criminal case with his attorney.  (Pl.'s Ex. 129).

- A handwritten copy of a letter drafted by Plaintiff on March 20, 2017, and mailed to his attorney on March 20, 2017, in which Plaintiff discusses his pending criminal case with his attorney.  (Pl.'s Ex. 130).

- A letter dated March 31, 2017, from Plaintiff's attorney in his pending criminal case. (Pl.'s Ex. 131).

- A letter dated July 20, 2017, from Plaintiff's attorney in his pending criminal case. (Pl.'s Ex. 133).

- A letter dated July 21, 2017, from the paralegal to Plaintiff's attorney in his pending criminal case. The letter was received on July 26, 2017, and stamped as "LEGAL MAIL" and "LEGAL MAIL – CONFIDENTIAL." (Pl.'s Exs. 134–35).

- An envelope received from his attorney in his pending criminal case on August 21, 2017, marked as "LEGAL MAIL – CONFIDENTIAL." (Pl.'s Ex. 136; Trial Tr. at 57:08–58:03).

- A letter dated October 2, 2017, from the paralegal to Plaintiff's attorneys in his pending criminal case. The letter was received on October 6, 2017, and stamped as "LEGAL MAIL." (Pl.'s Exs. 137–38).

- A handwritten copy of a letter drafted by Plaintiff on October 22, 2017, and addressed to the paralegal to his attorneys in his pending criminal case. (Pl.'s Ex. 139).

### 2.    MCSO Officials Opened, But Did Not Read, Plaintiff's Incoming Legal Mail in His Presence

At trial, Plaintiff described the process that occurred at Lower Buckeye when an inmate received incoming legal mail. A detention officer would bring an inmate's legal mail to their cell and open a "trapdoor" attached to the door of the cell. (Trial Tr. at 60:21). After opening and inspecting the incoming legal mail for contraband—whereby the officer would open and shake the envelope and any papers contained therein—the officer would place the papers back in the envelope and hand it to the inmate through the trapdoor. This legal mail inspection process could also happen in areas further removed from an inmate's cell, such as the dayroom. MCSO officers generally followed this process when delivering incoming legal mail to Plaintiff.

Furthermore, under MCSO's Inmate Mail policy at the time, DK-1, any inmate's incoming legal mail can only be opened and inspected in the inmate's presence. (Pl.'s Ex. 24 at 2). The purpose for opening and inspecting the incoming legal mail under the policy is to intercept contraband. (*Id.*). An MCSO employee is only permitted to *read* an inmate's legal mail, however, after obtaining a search warrant. (*Id.* at 6).

### 3.    Plaintiff Represented Himself in Several Other Legal Proceedings While at Lower Buckeye Jail

While Plaintiff was represented by legal counsel during his criminal proceedings, he also represented himself in other legal proceedings.  As of November 1, 2017, Plaintiff was representing himself in (i) a juvenile court case in the Maricopa County Superior Court, (ii) a civil matter in the Arizona Court of Appeals, and (iii) a federal civil rights case—*English v. Campagnolo et al.*, No. 2:17-cv-03221-GMS-JZB (D. Ariz.) [hereinafter *Campagnolo*]—that Plaintiff had initiated in the District of Arizona.  Plaintiff stored any papers in his possession from these cases, such as pleadings and court orders, in a box in his cell.

### 4.    Plaintiff Filed Many Grievances Against MCSO Officials and a Lawsuit Against Maricopa County Before the Cell Search

During his time at Lower Buckeye, Plaintiff frequently brought complaints—known as "grievances"—against the jail staff.[7]  Inmates at Lower Buckeye may file grievances to relay concerns about their confinement, including about the conduct of specific detention officers.

To submit a grievance, an inmate fills out a form detailing his allegations and places it into a crevice in his jail cell door for a detention officer to pick up.  A detention officer then signs and dates the grievance form and takes it for review.[8]  A detention officer next responds to the grievance.  If the grievance is filed against a particular officer, the officer must respond directly to the grievance.  After the officer reviews the grievance, the next level of review is by a detention sergeant.  The grievance is then returned to the inmate with the comments of the reviewing officer and sergeant attached.  If the inmate is dissatisfied with the officers' resolution of the grievance, the inmate may file an

---

[7] Plaintiff credited his proclivity for filing grievances to his familiarity with the court system and criminal justice system.  Plaintiff was a criminal justice major at the University of Houston and worked previously as a licensed process server and as a private investigator.  Plaintiff stated that his "career as a private investigator helped me a great deal in terms of navigating the jail grievance process." (Trial Tr. at 83:21–84:24).

[8] Attached to the form are two carbon copies—one yellow and one pink. A detention officer leaves with the original form and the yellow carbon copy.  The inmate keeps the pink carbon copy.

institutional appeal, followed by an external appeal.

Plaintiff's grievance activity was, at first, relatively subdued.  From February 1 to September 28, 2017, Plaintiff filed a total of three initial grievances and no appeals.  (Pl.'s Exs. 22–23, 29).  But in the month leading up to the Cell Search, from September 29 to October 31, 2017, Plaintiff submitted a total of 16 grievance filings:  ten initial grievances, four internal appeals, and two external appeals.  (Pl.'s Exs. 32–33, 35–47, 49).  And on the day of the Cell Search, in addition to filing a grievance describing the Cell Search, Plaintiff filed four internal appeals and one external appeal.  (Pl.'s Exs. 50–53, 55).[9]  Plaintiff testified that he found it difficult to get detention officers to pick up his completed grievance forms, and that detention officers often appeared agitated when having to deal with grievance forms.  (Trial Tr. at 66:04–19).

Plaintiff filed his complaint in *Campagnolo* on September 18, 2017.  The suit named multiple defendants, including several Maricopa County Superior Court judges, Phoenix Police Department detectives, Department of Child Safety personnel, and Maricopa County.  The complaint consisted of over 400 pages of Plaintiff's own handwritten allegations plus numerous additional exhibits, collectively totaling 876 pages. (*Campagnolo*, ECF Nos. 1–3).  Plaintiff's initial complaint was dismissed on October 2, 2017, by a screening order, and he filed a first amended complaint on November 9, 2017. The case was ultimately dismissed by this Court on January 5, 2018.  (*Campagnolo*, ECF Nos. 7, 10, 14).

### 5.    Plaintiff Was Granted "Pro Per" Status at Lower Buckeye

As a result of filing his federal civil lawsuit, Plaintiff was granted "pro per"[10] status at Lower Buckeye and provided with cardboard banker boxes and manila folders to store his legal materials.  Plaintiff was permitted to store legal mail, legal letters, legal documents, his own notes, file folders, and envelopes in his banker boxes.  Other than in these banker boxes, Plaintiff did not store his legal materials elsewhere in his cell.  On

---

[9] It was not established at trial whether Plaintiff filed these five grievances before or after the Cell Search took place.

[10] This term is synonymous with "pro se."

November 1, 2017, Plaintiff had at least one banker box for legal documents in his cell.

On the date of the Cell Search, Plaintiff had thousands of pages of documents in his banker box. This included the tens of pages of privileged legal communications between Plaintiff and his attorneys or mitigation specialists that were admitted into evidence. (Pl.'s Exs. 25–28, 127–31, 133–37, 139). These privileged legal communications were typically printed on pieces of white paper that were letter sized.[11] Plaintiff also kept in his box protected work-product notes related to his criminal case (*see* Trial Tr. at 28:12–14, 97:20–22), but none of these documents—whether redacted or unredacted—were introduced into evidence.

Plaintiff stored more than just privileged legal communications in his box. He also stored (i) documents from the cases in which he was proceeding pro se, (ii) copies of pleadings and motions that he had drafted, (iii) copies of pleadings and motions that he or his attorneys had filed, (iv) copies of pleadings and motions received from his litigation adversaries, (v) criminal discovery he had received, and (vi) transcribed witness statements. These papers were also letter-sized documents. Plaintiff testified that he may have had copies of grievances and inmate tank orders—letter-sized documents—in his cell on the date of the Cell Search, and that those documents "may or may not have been in [his] legal box." (Trial Tr. at 118:01–14; *see also* Pl.'s Ex. 2 at 1–2).

Plaintiff thus had scores of non-privileged documents in his banker box. Plaintiff testified that prior to October 10, 2017, he did not have the ability to photocopy documents that he had drafted. Thus, to preserve copies of his own documents after submitting a legal filing, Plaintiff, in addition to rewriting pages on his own with a golf pencil, had other inmates duplicate his written pleadings. This included his complaint in *Campagnolo*, which was hundreds of pages long. In exchange, Plaintiff provided these inmates with food items from the prison commissary, such as chips or honey buns. Plaintiff testified that he "commonly" utilized this practice prior to October 10, and that he had "several . . .

---

[11] In contrast, non-legal mail, defined as mail that inmates send to, or receive from, family, friends, and private organizations, is limited in allowable size to 4.25 inches by 6 inches (postcard size). (Pl.'s Ex. 24 at 1-2).

detainees copying those pages for me." (Trial Tr. at 148:23–150:06).

### C. Sergeant Cost and Sergeant Munnell Searched Plaintiff's Cell on November 1, 2017, and Opened and Inspected His Privileged Legal Communications

On November 1, 2017, Sgt. Cost and Sgt. Munnell conducted a search of Plaintiff's Cell. The search, which lasted around 30 to 40 minutes, resulted in the seizure of a black pen and several papers written in pen. Though Plaintiff claims that Defendants read through his privileged legal mail and seized his protected work-product notes, those contentions are not supported by the evidence in the record.

### 1. Background on the Defendants

At the time of the Cell Search, Defendants were employed as detention sergeants by MCSO and assigned to Lower Buckeye. Sgt. Cost worked as a detention sergeant at Lower Buckeye beginning in 2013, and Sgt. Munnell began working there three months prior to the Cell Search. As a part of their job responsibilities, detention sergeants such as Defendants train and supervise line officers, review inmate grievances against detention officers, and conduct searches of inmate cells for contraband.

### 2. Defendants Were Generally Familiar with Plaintiff, and His Reputation for Filing Grievances, Prior to the Cell Search

Defendants—prior to conducting the Cell Search—were both aware that Plaintiff had filed multiple grievances. Plaintiff's reputation for filing grievances was well known by the line officers at Lower Buckeye. (Trial Tr. at 242:02–243:14). Sgt. Cost testified that detention officers dislike when inmates file grievances against them, and that inmates who file a lot of grievances create stress for detention officers. (Trial Tr. at 191:15–20).[12] He also testified that he personally believed inmates "can" exaggerate, blow things out of proportion, and lie in their grievances. (Trial Tr. at 191:21–192:04).

However, of the 19 grievance filings submitted by Plaintiff from February 1 through

---

[12] Sgt. Cost also testified that if a detention officer has a grievance filed against them, the officer "could" feel that they (i) will be viewed negatively by their superior officer, (ii) might be given a negative performance assessment, and (iii) are being personally attacked by that inmate. (Trial Tr. at 191:04–14).

October 31, 2017, none were directed against Sgt. Cost or Sgt. Munnell.[13]  Plaintiff did not introduce any evidence at trial indicating that either Defendant reviewed, received, signed for, collected, or responded to any of Plaintiff's grievances submitted before the Cell Search.  In addition, Sgt. Cost and Sgt. Munnell were not named as defendants in Plaintiff's federal civil rights lawsuit, *Campagnolo*.  Nor did the lawsuit name the MCSO, the Sheriff, or any other MCSO employees.  Plaintiff did not introduce any evidence indicating that, prior to the Cell Search, either Defendant was aware of Plaintiff's claims in *Campagnolo*.

### 3.      Sgt. Cost Initiated the Cell Search and Requested Assistance from Sgt. Munnell

The standard practice for an officer at Lower Buckeye is to perform at least three cell searches during their shift.  (Trial Tr. at 170:12).  Searches are either random or targeted.  Random searches are conducted throughout the course of an officer's shift, such as when an officer goes on a security walk.  While there may not be a specific reason for a random search, the general purpose of these searches is to minimize and eliminate the possession of contraband in the jail facilities, given the threat contraband can pose to safety and security throughout the jail.  (Trial Tr. at 169:17–170:09).  MCSO's designee under Federal Rule of Civil Procedure 30(b)(6)—Sgt. George Alvarez—testified that one appropriate reason to conduct a random cell search is if that cell has not been searched for a long time.  (Trial Tr. at 170:14–16).  In contrast, a targeted search takes place when Jail Intelligence or detention officers have a suspicion that there is some evidence of criminal or administrative contraband contained within a cell.  (Trial Tr. at 168:23–169:16).

Both Defendants searched Plaintiff's Cell on November 1, 2017.  Sgt. Cost initiated the search, believing Plaintiff's Cell had not been searched in some time.  (Trial Tr. at 260:12–18; Pl.'s Ex. 4 at 2; Pl.'s Ex. 54 at 7).  As Sgt. Munnell testified, due to the volume of grievances filed by Plaintiff, line officers were reluctant to search Plaintiff's Cell.  (Trial Tr. at 242:02–244:03).  Sgt. Cost asked Sgt. Munnell for assistance with the Cell Search.

---

[13] The five additional grievance fillings submitted on November 1, 2017 (not including the grievance related to the Cell Search) also were not directed against Sgt. Cost or Sgt. Munnell.

(Trial Tr. at 244:12–14, 245:16–18).  While Sgt. Munnell testified that it was not "a daily thing" for two sergeants to conduct cell searches together, such searches would still "happen as needed."  (Trial Tr. at 244:20–245:02).

In an email dated November 6, 2017, Sgt. Cost wrote to his superior in the Criminal Intelligence Division—Sgt. Michelle Metzler—that "[t]here was no directive" to specifically search Plaintiff's Cell based on any information that he was storing contraband, and that "Sgt. Munnell and [Sgt. Cost] were performing random cell searches and Sgt. Munnell saw a great number of cheese sticks were in the cell and began to search."  (Pl.'s Ex. 4 at 2–3).  Sgt. Cost also wrote to Plaintiff on November 17, 2017, that the "searching of [Plaintiff's] cell was purely random."  (Pl.'s Ex. 54 at 7).  At trial, Sgt. Cost was unable to testify to any recollection of his motivation behind the Cell Search.  Sgt. Munnell testified that she "went into [Plaintiff's cell] because Sergeant Cost asked me to go into the cell," and that "I don't recall beyond that, reasons for the search."  (Trial Tr. at 245:06–18).

### 4. During the Cell Search, Defendants First Placed Plaintiff in the Shower Area, Before Later Locking Him Inside the Recreation Yard

Prior to November 1, 2017, Plaintiff's Cell had been searched multiple times.  In Plaintiff's experience, these searches typically lasted approximately two to five minutes.  Plaintiff testified that these cell searches were usually conducted by two officers:  one conducting the search, and the other watching over Plaintiff.  During these searches, Plaintiff usually sat at the tables in the dayroom or stood outside his cell.  (Trial Tr. at 89:06–90:01).

MCSO policy does not designate any specific area where an inmate must wait during a cell search.  Instead, officers conducting a cell search generally consider whether the inmate is a "safe distance" away from them.  Inmates are allowed to be present during a cell search if necessary.  (Trial Tr. at 274:19–21).  Sgt. Cost testified that he personally does not allow inmates to be present during a cell search, even when they request to do so.  Sgt. George Alvarez testified that the most common place for an inmate to wait during a

cell search is the dayroom, and that the distance from Cell 24 to the dayroom would typically be considered a safe distance by the officers conducting a search.  Sgt. Alvarez also opined that it is not always necessary for an officer to lock an inmate in the recreation yard during a cell search.  (Trial Tr. at 161:20–163:06).

Plaintiff was not allowed to stand outside of his cell to observe the Cell Search on November 1, 2017.  At approximately 3:00 p.m. that day, Sgt. Cost approached Cell 24, looked through its window, and wrote something down on the blue glove he was wearing.  (Trial Tr. at 88:18–89:05).   Sgt. Cost then left for a few minutes before returning to Plaintiff's Cell with Sgt. Munnell.  Sgt. Cost informed Plaintiff that he and Sgt. Munnell were going to search Plaintiff's Cell.  (Trial Tr. at 90:02–08).  Plaintiff asked Sgt. Cost if he "could stand there" or remain "present" while Defendants searched his jail cell.  (Trial Tr. at 90:17–22).

Sgt. Cost denied Plaintiff's request.  Instead, Sgt. Cost placed Plaintiff and his cellmate inside of the second-floor showers and instructed them to remain there.  (*See* Pl.'s Ex. 11).  While in the showers, Plaintiff was unable to observe the actions of Defendants during the Cell Search.  Concerned about his privileged legal documents in his cell, Plaintiff attempted to move closer to view the Cell Search.  After approximately two minutes, Sgt. Cost noticed that Plaintiff had left the shower area.  Because Plaintiff did not follow his order to stay put, Sgt. Cost took Plaintiff and his cellmate downstairs into the recreation yard and locked the door.  (*See* Pl.'s Ex. 10).  Sgt. Cost then continued searching Plaintiff's Cell with Sgt. Munnell.  (Trial Tr. at 92:19–94:12; Pl.'s Ex. 54 at 7).

### 5. Defendants Searched Plaintiff's Cell, Including His Legal Banker Box, for 30 to 40 Minutes

Defendants did not obtain a search warrant prior to searching Plaintiff's Cell.  The Cell Search lasted approximately 30 to 40 minutes.  Plaintiff observed the Cell Search through an upward trajectory from the window of the door of the recreation yard.  (*See* Pl.'s Exs. 10–11).  But Plaintiff's view was highly limited, given the small size of the window and the considerable distance between the recreation yard door and Plaintiff's Cell.  *See supra* Section II(A)(1).  Plaintiff testified that Defendants' "backs were to me, but I

could still see what they were doing in there to a certain degree." (Trial Tr. at 95:23–25). When asked to describe what he saw during the Cell Search, Plaintiff narrated the following:

> I saw the backs of Sergeant Cost and Munnell, and they were in my cell at least 30 minutes plus, and I just repeatedly watched them hold up documents [from the legal banker box]; and, you know, I came to the logical presumption that they were reading my documents and they were -- it appeared that they were sharing the documents with each other, pointing to them like they were reading the contents of them, and then sharing the contents of the documents with each other.

(Trial Tr. at 96:13–20).

But when asked whether he could see well enough to specifically identify which documents Defendants were looking at or reading, Plaintiff admitted he was unable to do so. He did testify, however, that he was able to see that Defendants were examining letter-sized—rather than postcard-sized—documents. (Trial Tr. at 97:02–11). These letter-sized documents could have been articles of Plaintiff's privileged legal mail, of which there were relatively few, or they could have been articles of Plaintiff's non-privileged legal documents, of which there were relatively many. Plaintiff was not, however, able to confirm that Defendants were reading his privileged legal mail. Instead, Plaintiff stated only that, "based on the totality of the circumstances, my *logical presumption* was that [Sgt. Cost] was reading my legal mail because [he and Sgt. Munnell were] holding it up and sharing it." (Trial Tr. at 124:16–125:03 (emphasis added)).

### 6. Defendants Opened and Inspected Plaintiff's Legal Materials to Search for Contraband

Detention officers at Lower Buckeye are trained to inspect materials in an inmate's legal box to search for contraband. MCSO policy permits detention officers to search an inmate's cell—including any legal materials stored in the cell—outside of the inmate's presence but instructs officers not to read the inmate's legal and personal mail. (Pl.'s Ex. 5 at 2). Sgt. Alvarez testified that officers need to search legal boxes when conducting random searches because inmates often conceal contraband in the boxes. Sgt. Metzler

also testified that officers who come across a legal box during a cell search are permitted to look inside it to ensure there is no contraband. (Trial Tr. at 273:13–16). Through their training, Lower Buckeye officers learn how to scan through legal mail in the original envelopes to make sure there is no contraband between the pages. The officers are taught how to scan through pages without reading them, which involves flipping through the documents. (Trial Tr. at 273:23–274:14).

While Sgt. Cost was unable to testify to his recollection of the events of the Cell Search, Sgt. Munnell testified that she searched through Plaintiff's legal banker box; pulled out the documents in the box; and flipped, held, and shook each document, one by one, for several seconds. (Trial Tr. at 248:14–249:05). She also testified that she did not read any of Plaintiff's legal mail during the Cell Search. (Trial Tr. at 318:21–22).

Defendants demonstrated to the Court how they generally looked for contraband in legal paperwork when conducting cell searches. Sgt. Munnell, when searching standard-sized envelopes, manila file folders, and larger manila envelopes, would first press or pat down on them to feel for any objects. Upon opening an envelope or folder, she would remove any paper and shake it. If Sgt. Munnell observed any writing on the paper, she would turn the writing away from herself before shaking the document. Sgt. Munnell was still able to make out if a document was typewritten versus handwritten, and if a document was written in pen versus in pencil. (Trial Tr. at 313:11–317:02). Sgt. Cost described a similar process where he would examine envelopes and folders for contraband and flip through individual papers without reading the documents. (Trial Tr. at 336:07–340:04).

> **7.    Defendants Seized a Pen and Materials Written in Pen from Plaintiff's Cell, and Plaintiff was Reprimanded For "Running Store"**

Upon conclusion of the Cell Search, Defendants haphazardly returned Plaintiff's legal materials to his legal box. (Trial Tr. at 100:03–11; Pl.'s Ex. 54 at 7). Defendants confiscated a black pen—which, as administrative contraband, Plaintiff was not permitted to keep in his cell—and several papers bearing Plaintiff's handwritten notes in ink. These documents included (i) one paper with Plaintiff's personal banking information, (ii) two

commissary receipts, and (iii) "receipts" for "running store."  (Pl.'s Ex. 4 at 1; Trial Tr. at 97:23).

### a.    "Running Store"

"Running store" is a colloquial term used by jail staff and inmates to describe the situation where an inmate loans commissary items to other inmates for profit.  For example, an inmate running store may give an inmate two food items, with the expectation that the receiving inmate would return three food items to the loaning inmate within the next week. (*E.g.*, Trial Tr. at 87:25–88:09).  Plaintiff testified that he had no reason to run store—or profit from other inmates—because his commissary account was well-funded and he had financial support from his friends and family.  (Trial Tr. at 88:10–17).  He also stated that it was common among detainees to exchange food items from the prison commissary, and that he had never witnessed an inmate being disciplined for gifting commissary items. (Trial Tr. at 97:16–22).

Running store is prohibited under the Rules and Regulations for Inmates at Lower Buckeye.  The applicable provision reads:

> [Inmates] may not barter, trade, pass, accept, or possess another inmate's canteen items.  The only canteen items [an inmate] will be allowed to have in [his] possession are those items that [he] purchased through the Canteen from [his] own account.  Inmates in possession of unauthorized canteen items, to include indigent inmates found in possession of canteen, other than Indigent Package items, will have those canteen items confiscated and may be issued a *Disciplinary Action Report* (DAR).

(Pl.'s Ex. 6 at 6).  Because running store creates debts between inmates, the practice is prohibited to prevent the threat and usage of violence to settle those debts.

### b.    Plaintiff's Return to His Cell

After the Cell Search, Defendants moved Plaintiff to a holding tank on the first floor. Sgt. Cost began to question Plaintiff on whether he was running store, to which Plaintiff replied that he was not.  Sgt. Cost then held up a pen and asked Plaintiff if he had stored a

pen in his cell, which Plaintiff denied.[14]  Another unnamed individual recorded the incident from a handheld video camera.  No footage of this recording was admitted into evidence.

Plaintiff testified that upon returning to his cell, he "realized that some of my handwritten transcription witness statements were missing from my criminal case." (Trial Tr. at 100:12–18).  The Court does not credit Plaintiff's testimony here for three reasons.

First, based on an email chain between Sgt. Metzler and Sgt. Cost from November 6–7, 2017, Sgt. Cost provided Sgt. Metzler with the documents seized by Defendants from the Cell Search.  (Pl.'s Ex. 4 at 2–3).  Sgt. Metzler reviewed these documents and stated, "I did not see 'Legal' paperwork, transcripts etc." (*Id.* at 1).[15]  Plaintiff introduces no evidence indicating that Defendants had any motive to withhold from Sgt. Metzler any documents seized from the Cell Search.  Plaintiff stated at trial that he has no evidence that Defendants passed on any confidential legal memoranda seized from his cell, nor does he have any evidence that the protected communications were leaked.  (Trial Tr. at 125:04–12).

Second, Plaintiff testified that he noticed only "some" of his handwritten transcribed witness statements missing upon returning to his cell.  But Plaintiff did not introduce into evidence *any* handwritten transcribed witness statements that he kept in his legal banker box.  In contrast, Plaintiff introduced into evidence multiple letters containing privileged attorney-client communications between himself and his attorneys that were in his legal box during the Cell Search.

And third, given the sheer number of pages in Plaintiff's legal box and the fact that Defendants did not return the legal box to the condition it was in before the Cell Search, it is more likely than not that Plaintiff mistakenly believed Defendants had seized some of his handwritten transcribed witness statements because he could not immediately locate them.  The Court thus finds that Plaintiff has failed to establish, by a preponderance of the

---

[14] Plaintiff claimed at trial that while he did not store any pens in his legal box, his cellmate had a pen, and that a pen was found in his cell during the Cell Search. (Trial Tr. at 137:07–20).

[15] In a note from Sgt. Cost to Plaintiff on November 17, 2017, Sgt. Cost also remarked, "As for your legal documents and transcripts, none were taken this was verified by another sergeant." (Pl.'s Ex. 54 at 7).

evidence, that Defendants seized any of Plaintiff's protected work-product notes.

### c.    The Disciplinary Action Report.

Plaintiff was disciplined after the Cell Search for purportedly running store and possessing an unauthorized item.  The formal statement of charge, dated November 1, 2017, alleged:

> On 11-1-17 at approximately 1513 hours, Sgt. Cost & Sgt. Munnell were conducting a random cell search in Tower 24A Pod.  Upon searching cell 24, Sgt. Cost found a pen in inmates [sic] English legal paperwork.  Also, a paper was found which showed he was ordering canteen for other inmates.  This type of behavior will not be tolerated.

(Defs.' Ex. 201).  After Plaintiff pleaded not guilty, the reviewing sergeant determined that Plaintiff was guilty of the offenses, stating:  "Inmate said he has other inmates write . . . copies for him and in turn orders store for them.  Inmate said he didn't have a pen. . . . Confirmed with Sgt. Munnell that a pen was found."  (*Id.*).  As a sanction, Plaintiff received seven days of "Full Restriction."  (*Id.*).

### D.    **After the Cell Search, Plaintiff Was Transferred to a Different Cell on November 7 and Was Transferred Again on November 22**

At approximately 6:30 p.m. on November 1, 2017—less than three hours after the completion of the Cell Search—Plaintiff filed a grievance against Defendants for the Cell Search.  (Pl.'s Ex. 54 (the "Cell Search Grievance")).  Sgt. Cost rejected the Cell Search Grievance on November 17, 2017, stating:

> Sergeant Munnell and I searched your legal materials and found several papers written presumably by your hand in pen. After searching your legal box we discovered a black pen concealed in your paperwork in the box you claimed was yours. . . . After the search we found a secondary black ballpoint pen that was concealed in your mattress.  The contraband that was found was removed and you were issued a Disciplinary Action Report for the contraband.

(Pl.'s Ex. 54 at 7).  Plaintiff unsuccessfully appealed the denial of this grievance.  (Pl.'s Ex. 67).

Plaintiff continued to file grievances against other officers.  Plaintiff filed one

- 21 -

grievance on November 3, 2017, and two more on November 7, 2017.  (Pl.'s Exs. 56, 58–59).[16]  He also received legal mail from his attorneys during this period.  (Pl.'s Ex. 141).

### 1.      The November 7, 2017 Cell Transfer

At approximately 5:32 p.m. on November 7, 2017, Plaintiff was transferred to Cell 25 of Pod A of Tower 23 at Lower Buckeye.  (Pl.'s Ex. 7; Pl.'s Ex. 15 at 6).  Prior to that date, Plaintiff had not been transferred to a different cell for almost six months.  (Pl.'s Ex. 7).  Plaintiff was not given a reason for the cell transfer, but Lower Buckeye's internal database designated "POD HARMONY/SOCIAL COMPATIBILITY" as the justification for the movement.  (Pl.'s Ex. 15 at 6).  Neither of the Defendants was listed as the officer who initiated the cell transfer (*id.*), though the officer who entered a transfer into Lower Buckeye's database is not necessarily the same officer who ordered the transfer.

Both Defendants worked "Shift Two" at Lower Buckeye, which took place from 2:30 p.m. to 10:30 p.m.  Thus, the cell transfer on November 7, 2017, occurred while both Defendants were on duty.  Neither Defendant was present at the cell transfer on November 7, 2017, however.  (Trial Tr. at 133:03–05).  Plaintiff interacted with Sgt. Cost the next day.  After Plaintiff asked why he was moved to another pod, Sgt. Cost replied, "That's none of your business."  (Trial Tr. at 99:19–23).

MCSO policy permitted any housing officer to order a cell transfer without requiring a particular justification, and cell transfers frequently occurred at Lower Buckeye.  Sgt. Alvarez testified that while officers are given discretion to move inmates, there must ultimately be "some cause" that is "reasonable" to justify the decision.  (Trial Tr. at 178:05–25).  Sgt. Metzler testified that if it is discovered that an inmate is running store in a housing unit, the best practice is to initiate a cell transfer to "disrupt the operation . . . for the safety of everyone involved in it."  That way, the inmate running store is "not able to follow through on the collection of those items or debts," which reduces the "risk for harm."  (Trial Tr. at 284:14–285:14)

The evidence indicates that Plaintiff's cell transfer on November 7, 2017, was—

---

[16] Plaintiff submitted a grievance on November 5, 2017, as well, but that grievance was not accepted by the detention officers.  (Pl.'s Ex. 142).

more likely than not—intended to disrupt his suspected "running store" activity and reduce the potential for debt-related security concerns. Sgt. Metzler emailed Sgt. Cost on November 6, 2017, at 7:56 a.m., writing, "Based on the info you uncovered about [Plaintiff] possibly running store, was the inmate relocated to another housing unit?" After Sgt. Cost replied that he and Sgt. Munnell had not yet relocated Plaintiff, Sgt. Metzler later that night wrote, "If [Plaintiff] is suspected of running store, moving him around will disrupt what he's doing and possibly reduce any debt issues that might come up." (Pl.'s Ex. 4 at 2–3).[17]

### 2.    The November 22, 2017 Cell Transfer

Plaintiff continued to file a host of grievances between November 7 and November 22, 2017. (Pl.'s Exs. 58–68). At approximately 11:27 a.m. on November 22, 2017, Plaintiff was transferred to Cell 17 of Pod B of Tower 24 at Lower Buckeye. (Pl.'s Ex. 7; Pl.'s Ex. 15 at 6). Lower Buckeye's internal database designated "POD HARMONY/SOCIAL COMPATIBILITY" as the justification for the movement. (Pl.'s Ex. 15 at 6). Since the cell transfer occurred in the morning, neither of the Defendants was on duty yet that day. Neither of the Defendants was listed as the officer who initiated the cell transfer. (*Id.*).

At trial, Plaintiff failed to present any direct or circumstantial evidence that Defendants caused or participated in Plaintiff's cell transfer on November 22, 2017.

### E.    Though Defendants Had a Duty to Preserve Video Footage of the Cell Search, Defendants Did Not Act with Intent to Deprive Plaintiff of the Footage

As the Court previously held, by November 30, 2017, Defendants had a duty to preserve any video footage capturing the Cell Search. (Doc. 161 at 8). Defendants could have, but failed, to take any steps to preserve video footage from Camera Angle 1, Camera

---

[17] At trial, Plaintiff argued that his conduct did not technically violate the Rules and Regulations for Inmates because he never bartered, traded, passed, accepted, or possessed "*another* inmate's canteen items" (*see* Pl.'s Ex. 6 at 6 (emphasis added))—instead, he merely passed *his own* canteen items on to other inmates. Regardless, given the outcome of the disciplinary action report (Defs.' Ex. 201) and the email communications between Sgt. Metzler and Sgt. Cost (Pl.'s Ex. 4), the evidence still demonstrates that Plaintiff was moved to disrupt his *suspected* "running store" activity.

Angle 2, or Camera Angle 3. The video footage from these three cameras of the Cell Search was automatically overwritten on December 31, 2017, and thus no video footage of the Cell Search was introduced into evidence at trial. *See supra* Section II(A)(2).

Because the Court determined that Plaintiff had demonstrated prejudice from the loss of any video surveillance of the Cell Search, the Court permitted the parties to present evidence and argument at trial regarding the loss of the video footage as a "measure no greater than necessary to cure the prejudice." (Doc. 161 at 11 (citation modified)). Having now reviewed the evidence presented by the parties, the Court finds that Defendants did not act with the intent to deprive Plaintiff of the video footage's use in this case. The Court thus will not adversely infer that the footage would have been favorable to Plaintiff's case. *See* Fed. R. Civ. P. 37(e).

> **1.  Defendants Believed That They Only Needed to Preserve Surveillance Footage of Incidents Alleging Excessive Force**

As detention sergeants, Defendants could have requested the preservation of certain surveillance footage. However, they did not do so in this case, because they subjectively believed at the time that they were not required to preserve footage if an inmate's grievance did not allege excessive force.

At the time of the Cell Search, MCSO policy did not generally require the preservation of surveillance footage in connection with inmate grievances. Instead, it was generally understood among officers that preservation was only required when an inmate alleged excessive force. (Trial Tr. at 267:02–22). MCSO only issued a mandate in December 2017—*after* the Cell Search—that required officers to preserve a greater amount of surveillance footage from grievances, such as the Cell Search Grievance. (Trial Tr. at 266:19–267:22; Trial Tr. at 261:14–25 (Sgt. Munnell testified at trial that while it was not considered best practice in November 2017 to preserve video footage after the filing of a grievance, it became best practice after the Cell Search)[18]).

---

[18] Though Sgt. Munnell first testified at trial that when an inmate files a grievance, preserving surveillance footage of the incident is "not routinely done" and not considered a best practice, she was presented with her deposition testimony in which she previously stated that it was considered best practice to preserve footage after the filing of a grievance.

Sgt. Cost similarly testified that he normally would only request preservation of surveillance footage capturing "something of a criminal nature." (Trial Tr. at 213:04–22 ("[I]f there's no criminal thing, there's no reason to request the preservation of video.")). When asked if it would "have even triggered in your head at all to preserve" footage based on the Cell Search Grievance, Sgt. Cost replied, "No, it's a standard cell search." (Trial Tr. at 342:22–11 ("We didn't preserve video over inmate grievances. This . . . was a cell search. It was . . . rather standard. We didn't preserve video for stuff like that.")).

Plaintiff thus has failed to establish, by a preponderance of the evidence, that Defendants acted with the intent to deprive Plaintiff of the video footage's use in this case.[19]

### 2.    The Surveillance Footage Would Not Have Shown Whether Defendants Read Plaintiff's Protected Legal Documents

Furthermore, even if footage of the Cell Search was preserved and admitted into evidence, it would not have shown whether Defendants read Plaintiff's properly marked legal mail or seized his protected work-product notes. Sgt. Metzler testified that, based on her familiarity with the camera quality of the surveillance cameras in Lower Buckeye from

---

(Trial Tr. at 254:15–255:06). Sgt. Munnell later clarified the inconsistency at trial, stating, "It wasn't until well over a month later [after the Cell Search] that we received an email from our chain of command that our practices -- our best practices were changing at that point. And I say 'best practices' because it wasn't written into policy at this point. So up to this point only excessive use of forces [sic] required preservation of video." (Trial Tr. at 267:07–18).

[19] Plaintiff unpersuasively argued at trial that Sgt. Munnell acted with intent to deprive Plaintiff of the video footage's use at trial because she selectively preserved some evidence while discarding other evidence.

While Sgt. Munnell preserved certain relevant items—such as Plaintiff's disciplinary action report (Defs.' Ex. 201), a copy of the Cell Search Grievance (Pl.'s Ex. 54), and emails related to the incident (Pl.'s Ex. 4)—she did not preserve any of the papers or pens seized from Plaintiff's Cell or the cheese sticks she had identified prior to searching the cell. However, Sgt. Munnell testified that she does not delete her emails. (Trial Tr. at 328:11–14). She also testified that she did not keep any administrative contraband of little to no monetary value—such as pens or cheese sticks—because MCSO policy did not require MCSO staff to retain it. (Trial Tr. at 262:01–07). Finally, she testified that she did not preserve any of the papers seized from Plaintiff's Cell because she and Sgt. Cost had turned those papers over to Jail Intelligence, and she did not believe that those papers had ever been returned to her. (Trial Tr. at 262:08–17).

In contrast, Sgt. Munnell testified that she only became aware she needed to preserve the disciplinary action report and the Cell Search Grievance after Plaintiff filed this lawsuit in 2019. But given that the video footage had been erased by that point, she was unable to preserve it. (Trial Tr. at 265:19–266:18). Thus, there is not sufficient evidence to find that Sgt. Munnell acted with the intent to deprive Plaintiff of the video footage's use.

- 25 -

her work in Jail Intelligence, though it might be possible to see inside of an inmate's cell, it was not possible to "zoom in close enough to be able to read something off of paper from" Camera Angle 1, Camera Angle 2, or Camera Angle 3. (Trial Tr. at 281:14–282:09).

Reviewing the sample surveillance video footage of Pod A demonstrates the accuracy of Sgt. Metzler's assessment of the video quality. (*See* Pl.'s Ex. 120). Due to the position of the cameras and the quality of the footage, any preserved footage would not have been able to show whether Defendants read Plaintiff's properly marked legal mail. Nor would it have been possible to identify the individual papers that Defendants seized from Plaintiff's Cell.

## III.   CONCLUSIONS OF LAW

### A.   Count I:  Improper Opening and Reading of Legal Mail

Plaintiff first alleges that Defendants violated the First Amendment by improperly opening, inspecting, and reading his privileged legal communications and protected work-product notes outside of his presence. Defendants, however, are entitled to qualified immunity on the issue of the opening and inspection of Plaintiff's privileged legal mail outside of his presence. And because Plaintiff has failed to prove by a preponderance of the evidence that Defendants read Plaintiff's mail, the claim fails.

#### 1.   Defendants Are Entitled to Qualified Immunity on the Issue of Opening and Inspecting Plaintiff's Privileged Legal Mail and Protected Work-Product Notes Outside of His Presence

##### a.   Defendants Have Not Waived Qualified Immunity

In addition to asserting that Defendants' read his legal mail,[20] Plaintiff asserts that it is also a violation the First Amendment for Defendants to open and inspect his legal mail—without reading it—during a cell search at which he is not present. Defendants, when making their oral motion for partial findings under Rule 52(c) after the conclusion of Plaintiff's case, raised the issue of qualified immunity with respect to the opening and inspection Plaintiff's legal mail outside of his presence. (Trial Tr. at 292:21–294:23).

---

[20] The Court uses the term "legal mail" broadly to cover Plaintiff's protected work-product notes as well.

Defendants previously raised qualified immunity as an affirmative defense in their answer (Doc. 117 at 5–6), but they did not file any dispositive motion on qualified immunity grounds prior to trial. Plaintiff contends that Defendant has waived the defense by waiting until trial to make a dispositive motion based on qualified immunity. Plaintiff is incorrect.

Qualified immunity shields state actors "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Because qualified immunity is an immunity from suit rather than a mere defense to liability," immunity disputes should be resolved "at the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 231–32 (2009) (citation modified). "Thus, defendants typically assert qualified immunity in a motion to dismiss or motion for summary judgment." *Thomas v. Cannon*, 289 F. Supp. 3d 1182, 1213 (W.D. Wash. 2018).

While the Ninth Circuit has not addressed the specific procedural scenario presented here, it has made clear that defendants may raise qualified immunity at trial by filing a motion for judgment as a matter of law. *See Tortu v. L.V. Metro. Police Dep't*, 556 F.3d 1075, 1083 (9th Cir. 2009). Additionally, district courts in the Ninth Circuit have permitted defendants to raise—for the first time in the case—the issue of qualified immunity at trial.[21] *See, e.g.*, *Williamson v. Edgley*, 2020 WL 6531010, at *7 (D. Idaho Nov. 4, 2020) (holding that since defendants pleaded qualified immunity as an affirmative defense in their answer, they could still raise it at trial in a motion for judgment as a matter of law (citing *Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009)); *Cannon*, 289 F. Supp. 3d at 1214 (finding that defendants did not waive qualified immunity by waiting until their Rule 50(a) motion to formally raise the issue for the Court's resolution); *Thompson v. City of Tucson Water Dep't*, 2006 WL 3063500, at *6 n.14 (D. Ariz. Oct. 27, 2006) (noting that "as the Ninth Circuit has generally found that qualified immunity can be raised in a Rule 50 motion, the Court will err on the side of caution and find that the qualified immunity defense has not

---

[21] Additionally, both the Eighth and Fifth Circuits have held that qualified immunity is not waived by a failure to assert the defense prior to trial. *Hill v. McKinley*, 311 F.3d 899, 902 (8th Cir. 2002); *Spann v. Rainey*, 987 F.2d 1110, 1114 (5th Cir. 1993).

been waived" where the defense was not raised until the fourth day of trial).

The Court adopts the reasoning from these cases as persuasive. Given that Defendants pleaded qualified immunity as an affirmative defense in each answer to Plaintiff's amended complaints (*see* Doc. 48 at 7; Doc. 117 at 5–6), Defendants have not waived the defense at trial. Plaintiff fails to identify any case in which a district court barred a defendant from raising qualified immunity at trial when the defendant had previously pleaded it as an affirmative defense.

Nor has Plaintiff demonstrated any prejudice from Defendants' failure to raise the defense earlier. At trial, Plaintiff argued that "waiver can be found where there's prejudice to the opposing party." (Trial Tr. at 297:16–19). But the only potential "prejudice" identified by Plaintiff was having to participate in discovery on the claim. (Trial Tr. at 297:21–299:13). Participating in discovery, however, is not cognizable as prejudice here. *See, e.g.*, *Aldrich v. Knab*, 858 F. Supp. 1480, 1500 (W.D. Wash. 1994) (finding no prejudice to plaintiff from defendants' late raising of qualified immunity at summary judgment because "plaintiffs failed to articulate any specific discovery they would have conducted had they known about the defense, or to point to examples of the absence of information in the record necessary for them to address the issue"). Similar to the plaintiffs in *Aldrich*,[22] Plaintiff fails to identify what discovery could have been conducted or avoided had the Court earlier granted qualified immunity based on the opening and inspection of Plaintiff's legal mail. Plaintiff still would have needed to conduct discovery on the issue of whether Defendants read Plaintiff's legal mail. Additionally, since Plaintiff averred at trial that he was still seeking declaratory relief on the issue of opening and inspecting Plaintiff's legal mail *even if* the Court were to grant qualified immunity (thus barring damages), Plaintiff would have needed to conduct the same discovery already completed for that portion of his claim.

---

[22] In contrast to *Aldrich*, Plaintiff argues that the prejudice here arises from having done *too much*—rather than too little—discovery. This cannot constitute prejudice under these circumstances. *Cf. Wizards of the Coast LLC v. Cryptozoic Ent. LLC*, 309 F.R.D. 645, 652 (W.D. Wash. 2015) (a "need for additional discovery" is "not sufficient to establish prejudice" in the context of a motion to amend).

Plaintiff was afforded ample opportunity to address the issue of qualified immunity at trial and in his proposed findings of fact and conclusions of law. Thus, having found no prejudice to Plaintiff, the Court will evaluate whether Defendants are entitled to qualified immunity.

### b.    Plaintiff's Defined Right is Not "Clearly Established"

Plaintiff can clear the qualified immunity hurdle only if he demonstrates that (1) Defendants "violated a federal statutory or constitutional right" and (2) the unlawfulness of the Defendants' conduct was "clearly established at the time" of the violation. *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)); *Shooter v. Arizona*, 4 F.4th 955, 961 (9th Cir. 2021) (plaintiff has burden of proof to demonstrate that the right was clearly established). The Court, in its discretion, can "address the clearly established prong of the qualified immunity test first." *Shooter*, 4 F.4th at 961 (internal quotation marks and citations omitted); *Callahan*, 555 U.S. at 236. If a right is not clearly established, the qualified immunity analysis ends. *Anderson v. Creighton*, 483 U.S. 635, 639–40 (1987).

A right is "clearly established" if, "at the time of the officer's conduct, the law was sufficiently clear that *every* reasonable official would understand that what he is doing is unlawful." *Wesby*, 583 U.S. at 63 (emphasis added) (internal quotation marks and citations omitted). While "a case directly on point" is not required, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Indeed, a clearly established right must derive from "settled law." *Wesby*, 583 U.S. at 63 (quoting *Hunter v. Bryant*, 502 U.S. 224, 228 (1991)). "It is not enough that the rule is *suggested* by then-existing precedent." *Id.* (emphasis added). Instead, the right must be dictated by either "controlling authority or a robust consensus of cases of persuasive authority." *Id.* (internal quotation marks and citations omitted).

The clearly established right must be defined with specificity. *City of Escondido v. Emmons*, 586 U.S. 38, 42 (2019) (reversing denial of qualified immunity at summary judgment where the lower court only defined the clearly established right "at a high level

of generality").  Here, the question is whether, as of November 1, 2017, it was clearly established that detention officers conducting a cell search were required to ensure an inmate's presence before opening or inspecting properly marked legal mail that had already been delivered to the inmate and was stored in the inmate's cell, legal boxes, or folders.  It was not.

Over fifty years ago in *Wolff v. McDonnell*, the Supreme Court upheld a prison regulation that permitted prison officials to open (but not read) an inmate's legal mail "as long as it is done in the presence of the prisoners." 418 U.S. 539, 575–76 (1974).  The Supreme Court reasoned that such a regulation would not "chill" an inmate's privileged communications with his attorney because "the inmate's presence insures that prison officials will not read the mail."  *Id.* at 577.  It also recognized the "possibility that contraband will be enclosed in letters, even those from apparent attorneys," which thus "surely warrant[ed] prison officials' opening the letters." *Id.*

*Wolff*'s holding was limited, however, to the opening and inspection of *incoming* legal mail.  *Id.* at 575 ("The narrow issue thus presented is whether letters determined or found to be from attorneys may be opened by prison authorities in the presence of the inmate or whether such mail must be *delivered unopened* if normal detection techniques fail to indicate contraband." (emphasis added)); *id.* at 576 ("[E]ven if one were to accept the argument that inspection of *incoming mail* from an attorney placed an obstacle to access to the court, it is far from clear that this burden is a substantial one." (emphasis added)).

Applying the reasoning in *Wolff*, the Ninth Circuit has clearly established that an inmate's incoming and outgoing legal mail can be opened and inspected by prison officials only when the inmate is present during the inspection.  Two cases establish this rule: *Nordstrom v. Ryan*, 762 F.3d 903 (9th Cir. 2014) and *Hayes v. Idaho Correctional Center*, 849 F.3d 1204 (9th Cir. 2017).

In *Nordstrom*, a Ninth Circuit panel held that an inmate alleging that prison officials read his outgoing legal mail properly pleaded a violation of his right to private consultation with counsel under the Sixth Amendment.  762 F.3d at 910–11 ("What the Constitution

- 30 -

does not permit, however, is reading outgoing attorney-client correspondence."). Citing *Wolff*, the panel rejected defendant-officers' contention that they were permitted to read the plaintiff-inmate's legal mail if they did so in his presence, noting "the chilling effect likely to result from an inmate's knowledge that every word he writes to his lawyer may be intercepted by prison guards and possibly used against him." *Id.* at 910. The panel remarked that "the practice of requiring an inmate to be present when his legal mail is opened is a measure designed to *prevent* officials from reading the mail in the first place." *Id.* (citing *Wolff*, 418 U.S. at 577). The panel made clear that "nothing prevents the [prison officials] from *inspecting* an inmate's outgoing mail, *in his presence*, to make sure that it does not contain, for example, a map of the prison yard, the time of guards' shift changes, escape plans, or contraband." *Id.* (second emphasis added).

Three years later, in *Hayes*,[23] a Ninth Circuit panel held that prison inmates "have a protected First Amendment interest in having properly marked legal mail opened only in their presence." 849 F.3d at 1211.[24] *Hayes*, however, similarly dealt with a situation where the plaintiff-inmate alleged that his incoming legal mail had been opened and inspected outside of his presence prior to its delivery. *Id.* at 1211–12. The Ninth Circuit panel there observed that "a prisoner who *receives* legal mail that has been opened and re-sealed may be justifiably concerned about the confidentiality of his communications." *Id.* at 1211 (emphasis added).

*Nordstrom* and *Hayes* did not address, however, whether an inmate, after having already received legal mail, is entitled to be present while a prison official opens and inspects that legal mail during a cell search. While Plaintiff argues that these cases clearly establish that MCSO's policy allowing legal mail to be inspected during cell searches outside of the inmate's presence is unconstitutional (*see* Doc. 173 at 18; Pl.'s Ex. 5 at 2),

---

[23] *Hayes* was decided on March 3, 2017, nearly eight months before the Cell Search took place.

[24] In a companion case, the same Ninth Circuit panel held that, under *Nordstrom*, an inmate has a Sixth Amendment right to be present when his incoming legal mail related to a criminal matter is inspected by prison officials. *Mangiaracina v. Penzone*, 849 F.3d 1191, 1195–98 (9th Cir. 2017).

this argument is unconvincing.[25]  Though "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question," *Taylor v. Riojas*, 592 U.S. 7, 9 (2020) (citations omitted), here, it was not obviously clear to every reasonable officer that opening and inspecting an inmate's properly marked legal mail during a cell search conducted outside of the inmate's presence would be unconstitutional.

Three cases are fatal to Plaintiff's argument:  *Bell v. Wolfish*, 441 U.S. 520 (1979); *Hudson v. Palmer*, 468 U.S. 517 (1984); and *Mitchell v. Dupnik*, 75 F.3d 517 (9th Cir. 1996).  First, in *Bell*, the Supreme Court held that pretrial detainees—like Plaintiff—do not have a Fourth Amendment right to be present when their cells and belongings in it are searched.  441 U.S. at 555–57.  The Supreme Court found that a jail rule that required "unannounced searches of inmate living areas at irregular intervals," where "inmates were not permitted to watch the searches," constituted an "appropriate security measure."  *Id.* Even though the Supreme Court recognized some benefit in permitting detainees to observe the searches—such as preventing "misuse by those [officers] conducting the search"—it nonetheless held that the rule "simply facilitate[d] the safe and effective performance of the search" and thus did not "render the searches 'unreasonable' within the meaning of the Fourth Amendment."  *Id.* at 557.

Next, in *Hudson*, the Supreme Court held that prison inmates have no reasonable expectation of privacy in their cells, reasoning that since the only place inmates can "conceal weapons, drugs, and other contraband" is in their cells, "*[u]nfettered access* to these cells by prison officials, thus, is imperative if drugs and contraband are to be ferreted out and sanitary surroundings are to be maintained."  468 U.S. at 527 (emphasis added). The Supreme Court accordingly determined that a random cell search conducted by defendant-officers—in which they also seized plaintiff-inmate's legal papers—did not

[25] Moreover, Plaintiff cites two out-of-circuit authorities—*Jones v. Brown*, 461 F.3d 353, 359 (3rd Cir. 2006) and *Gardner v. Howard*, 109 F.3d 427, 431 (8th Cir. 1997)—in support of his position that Defendants' conduct violated clearly established law.  But both cases similarly dealt with situations involving the opening and inspecting of inmates' *incoming* legal mail.  *Brown*, 461 F.3d at 355; *Gardner*, 109 F.3d at 429–31.

- 32 -

constitute an unreasonable search under the Fourth Amendment. *Id.* at 522–30.

Finally, in *Mitchell*, a Ninth Circuit panel evaluated the legality of a search of a pre-trial detainee's cell—in which officers inspected his legal papers—outside his presence. 75 F.3d at 522–23. Although the jail's own policy required a detainee's presence when his legal papers were being searched, the Ninth Circuit panel held that the defendant-officer's failure to follow that policy did not violate the plaintiff-detainee's protected liberty interest, reasoning that the detainee's cell and possessions were already subject to search. *Id.* at 523 (citing *Sandin v. Conner*, 515 U.S. 472, 486 (1995)). Recognizing the Supreme Court's holding in *Bell* that pretrial detainees are not entitled under the Fourth Amendment to be present during a cell search, the panel determined that "the inspection of [detainee]'s legal papers in his absence" was "not a dramatic departure from the basic conditions of incarceration." *Id.* (citing *Bell*, 441 U.S. at 555–57).

Taken together, these three cases—*Bell*, *Hudson*, and *Mitchell*—demonstrate that at the time of the Cell Search on November 1, 2017, existing Supreme Court and Ninth Circuit precedent did not clearly require an inmate's presence while officers opened and inspected the inmate's properly marked legal mail that had already been delivered and was stored among an inmate's property during a cell search. Plaintiff, aiming to distinguish *Mitchell*, argues that it is inapplicable because it (1) did not address the First Amendment question posed here, (2) predates *Nordstrom* and *Hayes*, and (3) dealt with "legal papers," rather than "properly marked legal mail." (Doc. 174 at 36–37). But each concern is inapposite.

First, while *Mitchell* (and *Bell* and *Hudson*) did not address the First Amendment question here, at a minimum, a detention officer, upon reading these three cases, could reasonably believe that the security concerns justifying cell searches might support a different set of jail procedures than those governing the handling of incoming and outgoing mail. *See, e.g.*, *Schenck v. Edwards*, 921 F. Supp. 679, 690 (E.D. Wash. 1996) ("One cannot legitimately extrapolate the reasoning . . . concerning incoming and outgoing grievance mail, and conclude that it amounts to clearly established law that an inmate's legal documents in his cell may only be inspected in his presence. Furthermore, a

reasonable officer could believe that inspecting an inmate's legal documents outside his presence is lawful, particularly in light of *Hudson v. Palmer* and *Mitchell v. Dupnik*."), *aff'd*, 133 F.3d 929 (9th Cir. 1998).  Thus, the law was not "sufficiently clear" to establish that "every reasonable official" would understand that opening and inspecting Plaintiff's legal mail outside of his presence during the Cell Search was unlawful.  *See Wesby*, 583 U.S. at 63.

Second, it matters little that *Mitchell* pre-dates *Nordstrom* and *Hayes* because those cases did not overrule *Mitchell*.  Nor does Plaintiff argue that *Mitchell* has been overruled. Since *Nordstrom* and *Hayes* did not address the issue of opening and inspecting legal mail during a cell search, it cannot be said that those cases placed the constitutional question here "beyond debate," particularly in light of *Mitchell*'s statement that the failure to permit an inmate's presence "add[ed] no unconstitutional dimension to the practice" of conducting random cell searches.  *See al-Kidd*, 563 U.S. at 741; *Mitchell*, 75 F.3d at 522–23.

And third, the fact that *Mitchell* dealt only with "legal papers," rather than "properly marked legal mail," cuts against Plaintiff's argument that his defined right is clearly established.  Because "legal papers" can be broadly construed to cover "properly marked legal mail," a detention officer could reasonably believe that *Mitchell* permitted Defendants to open and inspect—but not read—Plaintiff's legal mail outside of his presence.

Accordingly, Plaintiff has not met his burden of identifying "controlling authority or a robust consensus of cases of persuasive authority" clearly establishing a right to be present during the opening and inspection of his legal mail during the Cell Search.  *See Wesby*, 583 U.S. at 63 (citation modified).  Defendants thus are entitled to qualified immunity, and Plaintiff's claim for monetary damages on this issue is dismissed.

### c.    Plaintiff is Not Entitled to Declaratory Relief

Finally, Plaintiff makes a last-ditch effort to argue that, even if his damages action regarding the opening and inspection of his legal mail is dismissed, he is still entitled to declaratory relief on the constitutional question presented, averring that qualified immunity does not bar such relief.  But Plaintiff's argument fails because he does not have Article III

standing to bring a stand-alone claim for declaratory relief.

"A determination that a plaintiff has standing to seek damages does not ensure that the plaintiff can also seek injunctive or declaratory relief." *Clark v. City of Lakewood*, 259 F.3d 996, 1006 (9th Cir. 2001) (citation omitted), *as amended* (Aug. 15, 2001). To establish standing for a claim of declaratory relief, Plaintiff must demonstrate more than a past constitutional harm; instead, Plaintiff must establish "a sufficient likelihood that he will again be wronged in a similar way." *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983).

Plaintiff cannot demonstrate any sufficient likelihood that he will again be wronged in a similar way by Sgt. Cost or Sgt. Munnell, the only two defendants in this suit. Plaintiff concedes that he is no longer in the custody of MCSO and, thus, not subject to the supervision of Defendants. (Trial Tr. at 395:06–11).

Moreover, to the extent Plaintiff argues that his claim for declaratory relief is "intertwined with a claim for monetary damages," that argument lacks bite. *Lippoldt v. Cole*, 468 F.3d 1204, 1217 (10th Cir. 2006) (citation modified); *see also Rhodes v. Robinson*, 408 F.3d 559, 566 n.8 (9th Cir. 2005) (stating that when a "claim for damages necessarily entails a determination whether the officers' alleged conduct violated [plaintiff's] rights, [plaintiff's] separate request for declaratory relief is subsumed by his damages action."). Given that the Court has now dismissed Plaintiff's action for monetary damages on the issue of opening and inspecting his legal mail, his claim for declaratory relief is no longer "intertwined" with the damages claim.

Having found that Plaintiff lacks standing to pursue his claim for declaratory relief, this Court cannot issue an advisory opinion on the matter. Thus, Plaintiff's claim for declaratory relief on the issue of the opening and inspecting of his legal mail fails.

### 2.    Plaintiff Has Not Established That Defendants Read His Privileged Legal Mail and Protected Work-Product Notes

Remaining from Count I is Plaintiff's allegation that Defendants violated the First Amendment by reading his legal mail during the Cell Search. To succeed on this claim, Plaintiff must prove six elements: (1) Defendants acted under the color of state law; (2)

Defendants read Plaintiff's legal mail, *Nordstrom*, 762 F.3d at 910–11; (3) the legal mail in question was properly marked, *Hayes*, 849 F.3d at 1208–11; (4) Defendants did not have a legitimate penological reason for reading Plaintiff's legal mail, *Turner v. Safley*, 482 U.S. 78, 89–90 (1987); (5) Defendants' actions chilled Plaintiff's right to privately confer with his counsel, *Hayes*, 849 F.3d at 1212–13; and (6) Defendants' conduct was an actual cause of the claimed injury.

Plaintiff's claim fails on the second prong. As laid out above, Plaintiff has not proven by a preponderance of the evidence that Defendants read his legal mail during the Cell Search. *See supra* Sections II(C)(4)–(6).

During the first part of the Cell Search, when Plaintiff was standing inside the second-floor showers, Plaintiff had no visibility into his cell and, thus, could not observe Sgt. Cost and Sgt. Munnell. *See supra* Section II(C)(4). Next, when Plaintiff observed the Cell Search from the recreation yard, his view was highly limited. Plaintiff was unable to confirm that Defendants were reading his privileged legal mail or protected work-product notes. Instead, relying only on his "logical presumption," "based on the totality of the circumstances," Plaintiff cursorily alleges that Defendants read his legal mail. *See supra* Section II(C)(5). This is not sufficient evidence to support a finding that Defendants actually read Plaintiff's legal mail. And finally, given the testimony of Sgt. Cost and Sgt. Munnell at trial, in which they both demonstrated how they were trained to inspect materials in an inmate's legal box to search for contraband without reading the content of the papers, *see supra* Section II(C)(6), the Court determines that it is more likely than not that Defendants were opening and inspecting Plaintiff's legal mail in an inspection for contraband, instead of reading the mail.

Plaintiff provided no indication of any evidence that Defendants passed on or utilized any of the contents of his privileged legal mail. Nor does the evidence support any allegation that Defendants retained Plaintiff's legal mail or took notes regarding it. Defendants could not have read the hundreds of pages of documents in Plaintiff's legal banker box in a 30-to-40-minute search. *See supra* Sections II(B)(5), (C)(7). And with no

basis to enter an adverse inference against the Defendants for their failure to retain the video footage capturing the Cell Search, *see supra* Section II(E), the Court cannot find that Defendants improperly read Plaintiff's legal mail.

Accordingly, the Court enters judgment in favor of the Defendants on Count I.

### B.    Count II:  Illegal Retaliation

In Count II, Plaintiff alleges that Defendants illegally retaliated against him, in violation of the First Amendment, after he filed multiple grievances against MCSO officials and a lawsuit against Maricopa County.  Plaintiff claims illegal retaliation for three discrete incidents:  (i) the Cell Search, (ii) Plaintiff's cell transfer on November 7, 2017, and (iii) Plaintiff's cell transfer on November 22, 2017.

Inmates have a First Amendment right to file grievances and civil rights lawsuits. *Rhodes*, 408 F.3d at 567 (first citing *Bruce v. Ylst*, 351 F.3d 1283, 1288 (9th Cir. 2003); then citing *Schroeder v. McDonald*, 55 F.3d 454, 461 (9th Cir. 1995)).  "Within the prison context, a viable claim of First Amendment retaliation entails five basic elements:  (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal."  *Id.* at 567–68 (footnote omitted); *accord Bird v. Dzurenda*, 131 F.4th 787, 790–91 (9th Cir. 2025) (identifying same elements).

Plaintiff's claim fails on the second prong.  He cannot demonstrate that any of the three pertinent events were initiated "because of" his protected First Amendment conduct. *See supra* Sections II(B)(4), (C)(2)–(3), (C)(6)–(7), (D).

### 1.    Legal Standard for Retaliatory Intent

To establish a retaliatory motive, an inmate "must show that his protected conduct was the substantial or motivating factor behind the defendant's conduct."  *Johnson v. Ryan*, 55 F.4th 1167, 1201–02 (9th Cir. 2022) (citing *Brodheim v. Cry*, 584 F.3d 1262, 1271 (9th Cir. 2009)).  A plaintiff may offer "either direct evidence of retaliatory motive or at least one of three general types of circumstantial evidence [of that motive]."  *McCollum v. Cal.*

*Dep't of Corr. & Rehab.*, 647 F.3d 870, 882 (9th Cir. 2011) (quoting *Allen v. Iranon*, 283 F.3d 1070, 1077 (9th Cir. 2002)).   Circumstantial evidence of motive includes: (1) proximity in time between the protected conduct and the alleged retaliation, (2) the defendant's expressed opposition to the conduct, or (3) other evidence that the reasons proffered by the defendant for the adverse action were false and pretextual.  *McCollum*, 647 F.3d at 882 (citing *Allen*, 283 F.3d at 1077).  A causal connection between the adverse action and the protected conduct can be shown by a chronology of events from which retaliation can be inferred.  *Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012); *Pratt v. Rowland*, 65 F.3d 802, 808 (9th Cir. 1995) ("[T]iming can properly be considered as circumstantial evidence of retaliatory intent.").   However, mere speculation that the defendants acted out of retaliation is not sufficient.  *Wood v. Yordy*, 753 F.3d 899, 905 (9th Cir. 2014).

> **2.    Plaintiff Has Not Established That His Protected First Amendment Activity Was the Substantial or Motivating Factor Behind the Cell Search, the November 7 Cell Transfer, or the November 22 Cell Transfer**

Here, Plaintiff has not identified any direct evidence of retaliatory motive.  Instead, Plaintiff relies solely on circumstantial evidence.   But Plaintiff's causal chain is too attenuated to support a finding of retaliatory intent by either Defendant.

> **a.    The Cell Search Was Not Retaliatory**

First, Plaintiff alleges that Defendants—by initiating the Cell Search—took adverse action against him[26] because of his frequent grievance filings against MCSO detention officers and his civil rights lawsuit against Maricopa County.  Plaintiff theorizes that, because line officers at Lower Buckeye disliked inmates filing grievances against them— which caused them stress—the officers who were the subject of Plaintiff's voluminous grievances raised their displeasure to their superiors, such as Sgt. Cost.  These same line officers, wary of any additional grievance filings by Plaintiff, avoided conducting searches of Plaintiff's Cell.  Thus, to chill Plaintiff's grievance and litigation activity—which was

---

[26] The Court assumes, without deciding, that the Cell Search constituted an "adverse action" for this portion of the analysis.

protected by the First Amendment—Defendants took matters into their own hands on November 1, 2017, when they rummaged through Plaintiff's legal box for 30 to 40 minutes.

But this theory is too speculative to establish that Sgt. Cost and Sgt. Munnell acted out of retaliation. Critically missing in Plaintiff's causal chain is any evidence that these officers in particular were motivated by Plaintiff's grievance filings or his civil rights lawsuit. Neither Defendant played any role in the collection, review, or response to the 19 grievance filings submitted by Plaintiff—none of which were directed against Defendants—before the Cell Search. Nor were they aware of Plaintiff's civil rights lawsuit at the time. *See supra* Sections II(B)(4), (C)(2).

Instead, Plaintiff has only established that he had a reputation for filing grievances, and that Defendants were aware of such reputation. Plaintiff, in essence, asks this Court to attribute the alleged retaliatory intent of the line officers receiving Plaintiff's grievances to the Defendants in this case. But without any probative evidence, the Court cannot do so here. *Cf. Wood*, 753 F.3d at 904–05 (9th Cir. 2014) (dismissing claim for First Amendment retaliation, even where plaintiff identified statements by prison officials "expressing dislike" for plaintiff, where there was no specific evidence linking defendants' conduct as a response to plaintiff's protected activity); *Pratt*, 65 F.3d at 807 (dismissing claim for First Amendment retaliation where there was "no probative evidence to establish a crucial link in the logical chain required to support" a finding of retaliation).

Moreover, the other example of circumstantial evidence provided by Plaintiff— purported inconsistencies in the given rationales behind the Cell Search—is insufficient to establish an inference of retaliatory motive by a preponderance of the evidence. Sgt. Cost's stated reasons for the Cell Search are not inconsistent. The evidence demonstrates that Sgt. Cost initiated the Cell Search, believing that Plaintiff's Cell had not been searched in some time. This was a legitimate reason to conduct a cell search, per the credible testimony of Sgt. Alvarez. Sgt. Cost then enlisted the help of Sgt. Munnell to conduct the search. This, too, was not an uncommon practice. Before entering Plaintiff's Cell, Sgt. Munnell observed cheese sticks in Plaintiff's Cell. The pair then began the search. *See supra*

Section II(C)(3).

As the Supreme Court has cautioned, "'federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment,' especially with regard to 'the fine-tuning of the ordinary incidents of prison life, a common subject of prisoner claims.'" *Pratt*, 65 F.3d at 807 (quoting *Sandin*, 515 U.S. at 482–83). Given the need for prison officials to conduct searches of inmates' cells to prevent the storage of contraband, Defendants have proffered a legitimate correctional basis for the initiation of the Cell Search. *See supra* Sections II(C)(3), (6)–(7). As such, the Court finds no retaliatory motive by the Defendants when conducting the Cell Search.

### b.    The Cell Transfer on November 7 Was Not Retaliatory

Next, Plaintiff alleges that his transfer to a cell in a different tower on November 7, 2017, was also in retaliation for his grievance filings. But the evidence establishes that the cell transfer was intended to disrupt Plaintiff's suspected "running store" activity and reduce the potential for debt-related or security concerns. On November 6, 2017—the day before the transfer—Sgt. Metzler suggested to Defendants that Plaintiff be transferred to a different cell to "disrupt what he's doing and possibly reduce any debt issues that might come up." Even though Plaintiff may not have technically been "running store" under MCSO policy, he was still written up for doing so. Transferring an inmate to interrupt suspected rule violations and reduce potential debt-related security concerns reasonably advances legitimate correctional goals. *See supra* Sections II(C)(7), (D)(1). As such, the Court finds that Defendants have put forth an adequate, non-retaliatory basis for the cell transfer on November 7.

### c.    Defendants Were Not Linked to the November 22 Cell Transfer

Finally, Plaintiff cursorily avers that his cell transfer on November 22, 2017, was also motivated by retaliatory intent. But Plaintiff failed to present any direct or circumstantial evidence that Defendants caused or participated in Plaintiff's cell transfer on November 22, 2017. *See supra* Section II(D)(2). Accordingly, the Court finds that Plaintiff has failed to establish any causal nexus between his cell transfer on November 22

and any action by Defendants.

With no basis to find any retaliatory motive on the part of Defendants, Plaintiff's First Amendment retaliation claim must fail. Accordingly, the Court enters judgment in favor of Defendants on Count II.

## IV. CONCLUSION

Defendants are entitled to qualified immunity on Plaintiff's claim that they violated the First Amendment by opening and inspecting his legal mail in his cell outside his presence. Additionally, Plaintiff has failed to establish that Defendants read his legal mail during the Cell Search. Nor has he established that Defendants retaliated against him for engaging in protected First Amendment conduct. For these reasons, the Court concludes that Plaintiff's claims are without merit.

**IT IS THEREFORE ORDERED** that Defendants' Motion for Judgment on Partial Findings Under Qualified Immunity (Doc. 175) is **GRANTED**.

**IT IS FURTHER ORDERED** that the Court finds in favor of Defendants on Count I and Count II of this action.

**IT IS FURTHER ORDERED** that the Clerk of Court terminate this action and enter judgment accordingly.

Dated this 4th day of June, 2026.

_____
G. Murray Snow
Senior United States District Judge

- 41 -